Jerry R. Collins, Minor, by Howard L. Collins, His Father and Next Friend, Appellee, v. City of Chicago, Appellant.

Gen. No. 42,088.

74

Heard in the second division of this court for the first district at the December term, 1941. Opinion filed December 14, 1943.

BARNET HODES, Corporation Counsel, for appellant; JAMES A. VELDE, PAUL A. H. SHULTS, JOHN F. O'MALLEY and LOUIS H. GEIMAN, Assistant Corporation Counsel, of counsel.

H. H. PATTERSON and NORMAN PETERS, both of Chicago, for appellee; EDMUND C. MAURER, of Chicago, of counsel.

MR. JUSTICE SCANLAN delivered the opinion of the court.

In an action to recover damages for personal injuries sustained by plaintiff, a minor, a jury returned a verdict finding defendant guilty and assessing plaintiff's damages in the sum of $20,000. Defendant's motions for a directed verdict, for judgment notwithstanding

the verdict, and in arrest of judgment were overruled and judgment was entered upon the verdict. Defendant made no motion for a new trial. Defendant appeals.

This case seems to have been well tried and the many points usually raised in personal injury cases are not raised here.

In the latter part of October, 1938, the Water Pipe Extension Department of Chicago commenced the installation of a new water main in the west parkway of South Kolin avenue from 26th street to 24th place. Starting at 26th street and proceeding north, an excavation approximately thirty inches wide and six feet deep, was made in the parkway. At the time of the accident, November 3, 1938, the excavation had "only reached 25th Street." The accident happened at 25th place, which is half way between 25th street and 26th street. The ditch was open in the parkway, which is located between the west curb of Kolin avenue and the sidewalk, no part of the ditch being in the part of the street reserved for vehicular traffic, except the excavation in 25th place, where the accident happened. Part of the ditch near 26th street, where the pipe had already been put in, had been "filled back." There was a public school and playground at the northeast corner of Kolin avenue and 25th place. After supper on November 3, 1938, Jerry R. Collins, the plaintiff, then eight years old, and who lived near by, at 2652 Kolin avenue, went to play with a friend, Richard Schreiner, then ten years old, in the school playground, which had swings, slides, basketball baskets, etc., for the use and amusement of the children, and which was kept open in the evening until nine o'clock. On that evening "there were a lot of boys and girls" playing there. Plaintiff and Richard left the playground about 8:30 o'clock and crossed Kolin avenue. Plaintiff testified that there was a ditch there and some lanterns; that he did not see any wooden barriers; that on the other side

of the sidewalk there were wooden horses, but not around this hole; that "these lanterns and the hole attracted us there and we thought we would play there for a while. I had never played there before;" that he and Richard went into the ditch and put sticks into the dirt around the sides and played a game that they called airplane; that the ditch at that place was "sort of cross-shaped;" it was about four feet deep and about up to his shoulders; that they put sticks in the walls and played that the sticks were airplane controls; that after they played airplane for a while they got out of the ditch and saw that one of the lanterns was not lit and Richard got a stick and tried to light it on a flare that was standing in the street; that they were both out of the ditch when this happened. "Q. And what did Richard do? A. He got a stick and he was trying to light it and this flare upset and it exploded. . . . Q. What, if anything, did you hear? A. It was sort of a hollow sound went off. Q. And when that happened, what did you see, what happened to you? A. There was a burst of flame, and I caught on fire and I jumped back and I fell in this hole. Q. And what, if anything, did you feel when this sound was heard? A. Well, there was some liquid was spread on me, then I caught fire." The witness further testified that before that night he had been by this ditch when he went to the playground but that he had never played in it. "Q. What have you seen around there before? The Witness: I saw some boys were playing around there sometimes and they were lighting paper sticks from the fire on the flares." Upon cross-examination the witness stated that on that evening before they went into the playground he saw boys playing around this ditch; that there were no lights in the ditch; that the lanterns and torches were on the dirt that had been spilled out from the ditch. Richard Schreiner testified that he called for Jerry at his home and they went to the playground,

where they played on the slides; that there were many
boys about his age playing there; that to reach the
playground they had to cross Kolin avenue; that when
they left the playground about 8:30 o'clock it was
dark; that at Kolin avenue and 25th place they were
"putting some kind of water pipes in" on the west
side of Kolin avenue; that he and Jerry went to the
hole on the northwest corner "out in the street;" that
the hole at that place "was like a cross, and we were
playing airplane there;" that they "stuck sticks inside
the ground and alongside of the hole, and played for
controls and things like that;" that while they were
playing they saw that a kerosene lantern was unlit
and they climbed out of the hole and found some sticks
and tried to light that lantern, which was on a wooden
horse alongside the sidewalk; that he got a twig and
tried to light it on a flare which was standing along-
side the curb in the street; that the flare was lighted.
"Q. And just tell all of us here what happened. A.
Well, I got the stick and I tried to light it on the—
on that flare, and it didn't, of course, so I tried it again,
and then that flare accidentally tipped over, and a
burst of flame came from the flare, and I jumped over
a dirt pile, and Jerry jumped back and fell in the hole
and caught on fire. Q. What, if anything, did you
hear when this happened? A. Like a bang, a noise."
The witness further testified that he tried to toss dirt
on Jerry, who was in the hole, and then a man in a
car came up and tossed dirt on Jerry and then the man
went to the back of his car, got out a blanket and
wrapped it around Jerry; that before that eve-
ning "the kids on the block played there," "the
kids were digging holes, you know. There was a
long hole, then they started digging another hole, then
they used these flares. They got paper and made
torches out of it, and they have lights;" that before
that evening he had seen a watchman around there
but not that night; that from the time they started

playing until Jerry was taken away he did not see the watchman; that at other times before the evening of the accident he had seen the watchman "walk along Kolin Avenue, where the ditches were, and chase the kids away." Upon cross-examination the witness stated that he did not know what caused the flare to tip over; that neither he nor Jerry kicked it over and that the twig did not tip it over; that he and Jerry were kneeling on the ground at the time the flare tipped; that about two days before that evening he had lit paper from the flare but that he did not tip the flare; that the unlit lantern was right near the flare; that before he tried to light the stick he had opened the top of the lantern in order to light it; when the flare tipped over it did not stay tipped but "went back again." Richard Jouza testified that he lived on 25th place about three or four houses from Kolin avenue; that he knew plaintiff but did not see the accident. "Q. What had you seen children doing there on the night before this boy was hurt? A. Well, lighting torches, running around, playing and all sorts of things. Q. Lighting torches from where? A. From oil lamps. Q. And torches, what do you mean by that? A. Well, take long sticks and wrap paper or something around them, and stick them in the fires, and run around with them. Q. Fire from where? A. From the oil lamps. Q. Well, what kind of lamps do you mean? You mean a lantern? Do you mean a lamp or a flare, or what do you mean? A. It is a square sort of—I don't know what you call them. Q. Those open flares? A. Yes, sir. Q. Had you done that yourself? A. Yes, sir. Q. And had you seen other children do it? A. Yes, sir." Upon cross-examination the witness testified that the watchman "was around there sometimes. I hardly had seen him though. . . . He was a stout man. . . . Q. And when he came around, you ran away from those torches, didn't you? A. Yes, sir." Anton Motycka testified that he lived

at 2213 South 56th avenue, Cicero, and for eighteen years had been engaged in the fruit and vegetable business; that about 8:30 o'clock on the evening in question he was driving east on 25th place in his automobile and as he approached Kolin avenue and 25th place he noticed the excavation and then he saw a burst of flames flare up into the air from the excavation; that he stopped when he reached the spot, jumped out of his car, ''looked down into the hole and there was a boy on fire;'' that he then dragged, pulled the boy out of the pit; that he was burning from the waist up, and ''when I got him out of the hole I stood the boy up and the flames were shooting from his waistline to about three feet over his head. I tried to get the flames out with loose dirt that was there from the pit but it didn't work, so I thought of my robe in the car and I ran to the car and grabbed that robe and put it over the boy's head and smothered the flames;'' that he, the witness, ''called for help, but nobody showed up;'' and that he then put the boy in his car and took him home. Upon cross-examination he testified that in putting out the fire several of his fingers were burned very much; that he saw the other boy after he got plaintiff out of the hole; that he did not know the plaintiff nor his family and that he had never seen plaintiff since the evening of the accident.

We quote from the brief of defendant: ''The burns received by the plaintiff were extremely severe. He was subjected to a long course of medical treatment. A physician who examined him in January, 1941 found extensive scarifications of the tissues covering almost the entire part of the body from the waist up. The scars about the neck were so contracted that they held the head in a downward, tilted position, so that the plaintiff could not bring his head upwards and backwards. There were also contracting bands about the armpit and breast restricting the outward motion of the arm. There were scars on the back of the left

hand.'' The foregoing statement does not fully present the boy's injuries. However, defendant does not question the amount of the verdict. Richard Schreiner was not burned.

Defendant states: ''The defendant's theory is that the evidence does not show that the flare exploded or that the flare was an attractive nuisance or that the defendant was otherwise guilty of negligence.'' As to the errors relied upon for reversal defendant states: ''1. The verdict of the jury is contrary to law. 2. The trial court erred in not sustaining the defendant's motions for a directed verdict, for judgment notwithstanding the verdict, and in arrest of judgment.'' Defendant contends that plaintiff failed to make out a *prima facie* case and that the trial court erred in not directing a verdict for defendant, and it asks us to reverse the judgment and enter judgment here for defendant.

The following is plaintiff's theory of the case: ''Plaintiff contends, and it is charged in the complaint, that the open ditch with the lighted torch and open flame flares was an attraction to children and an inducement to them to play about the ditch and with the lighted flares, and that the defendant knew or should have known all of said facts, that in addition plaintiff's theory of the case is that this particular flare was not in proper and safe working order; that the watchman stationed there by defendant failed to perform his admitted duty, and that said bomb flare contained a fuel that was highly volatile and dangerous, so that when it was tipped over by the children in play it exploded.''

'' 'A motion to instruct the jury to find for the defendant is in the nature of a demurrer to the evidence, and the rule is that the evidence so demurred to, in its aspect most favorable to the plaintiff, together with all reasonable inferences arising therefrom, must be taken most strongly in favor of the plaintiff. The

evidence is not weighed, and all contradictory evidence or explanatory circumstances must be rejected. The question presented on such motion is whether there is any evidence fairly tending to prove the plaintiff's declaration. In reviewing the action of the court of which complaint is made we do not weigh the evidence,—we can look only at that which is favorable to appellant. *Yess v. Yess,* 255 Ill. 414; *McCune v. Reynolds,* 288 id. 188; *Lloyd v. Rush,* 273 id. 489.' (*Hunter v. Troup,* 315 Ill. 293, 296, 297.)" (*Mahan v. Richardson,* 284 Ill. App. 493. See, also, *Wolever v. Curtiss Candy Co.,* 293 Ill. App. 586, 597.)

The foregoing rules also apply to a motion for judgment notwithstanding the verdict. Despite the foregoing firmly established principles of law defendant has seen fit to cite as facts for us to consider in passing upon its contentions evidence introduced by it in rebuttal of plaintiff's evidence.

The major contention of defendant is that the verdict of the jury cannot be sustained on the theory of an attractive nuisance. In the instant case the accident happened in a public street and plaintiff was not a trespasser at the time that he was injured.

In *Flis v. City of Chicago,* 247 Ill. App. 128, we had before us a case where the city placed on a public street a tar kettle for boiling tar for street repairs near the home of a five year old boy, who was killed by the tar from the tilting of the kettle through his play. To quote from our opinion in that case (pp. 131, 132):

". . . The number of so-called attractive nuisance cases has increased greatly in Illinois during the past ten years, but in nearly every case where the question has been passed upon by the upper courts the *locus in quo* was privately owned property and the child injured or killed a trespasser. In the present case the accident happened in a public street and the deceased was not a trespasser at the time he was in-

jured. (*Deming v. City of Chicago*, 321 Ill. 341; *Stedwell v. City of Chicago*, 297 Ill. 486.) In the recent case of *Holmberg v. City of Chicago*, 244 Ill. App. 505, 514, the court said: 'Many physical conditions on a highway might exist which would be attractive and dangerous to children, and a ground for liability in case of injury, which would be looked upon as entirely innocuous if on private property.' In a trespass case involving an alleged attractive nuisance, the plaintiff seeks to excuse the trespass on the ground that there was an attractive nuisance on the premises of the defendant and it is the policy of the law to require the plaintiff in such a suit to make out a very clear case of attractive nuisance. But a distinction must be drawn between such cases and the instant one where children playing upon the public street, as they lawfully might, would be more apt to be attracted by the tar kettle placed on the street than if it had been located upon the private property.''

We further said (p. 133):

''Unless the facts in the present case are such that all reasonable minds would draw therefrom no other inference than that the tar kettle and the manner in which it was used did not constitute an attractive nuisance, the question became one of fact for the jury to determine. (*City of Pekin v. McMahon*, 154 Ill. 141, 147–152; *True & True Co. v. Woda*, 201 Ill. 315, 318; *Stollery v. Cicero & P. St. Ry. Co.*, 243 Ill. 290, 292; *Stedwell v. City of Chicago, supra; Anderson v. Karstens*, 218 Ill. App. 285, 292; *Holmberg v. City of Chicago, supra.*)''

In *Holmberg v. City of Chicago*, 244 Ill. App. 505 (cert. denied by the Sup. Court), the plaintiff's intestate, an eleven year old boy, was smothered in a sand pile into which he had dug and which the City had allowed its public contractor to pile some eight feet high in a public street. The Appellate Court held that the question as to whether the sand pile constituted

an attractive nuisance was a question of fact for the jury to determine and that the trial court was not justified in setting aside the finding of the jury that it was an attractive nuisance. The court said (pp. 509, 510):

". . . It may be assumed, as a matter of common knowledge, that a pile of sand, especially when located on a public street, would prove attractive to the children of the neighborhood. That it did so prove, in fact, is shown by the testimony of the witness Anderson, the owner of the property in question, who testified that several times he had seen children about the sand pile digging caves, and had chased them away. The question then arises, Did the sand pile, in the form in which it was permitted to remain in and along Pine Grove Avenue for some days, present a dangerous situation? And further, Should the defendants have been forewarned, when reasonably considering the matter, that if the sand pile were permitted to remain as it was, injury was likely to occur to some child who might be there to play?"

The court further said (pp. 511, 512):

"In nearly every case where the question has arisen, the *locus in quo* was privately owned property, and the child, in the nature of a trespasser, a condition that would not be, in all probability, as alluring, and therefore not fraught with as much danger, as where the *locus in quo* was a public street, created for, and to be used freely by all, its very existence inviting and implying user.

"The question arises whether Bairstow, or the City or both, did or failed to do something in a reasonably careful way, and as a result of the omission or commission, the boy, without negligence on his part, was killed. In the instant case, at first blush, knowing the instincts and the natural urge of children to play and make certain childish adventures, and particularly their natural liking, one might almost say passion, for

a sand pile as a source of pleasure, one is inclined to conclude that just such a calamity as happened might have been expected, or anticipated, or thought of as not unreasonably probable. Certainly it must be considered as proper to charge Bairstow and the City with the knowledge that children would go there and would play about, on, and dig into the sand pile. Being chargeable with that knowledge, would they also be expected to realize that if children did go there and play and dig, that some one might, by so playing and digging, get in deep enough to be injured? What knowledge they had and what, considered as average reasonable persons, they were bound to expect, were matters of fact. Were they such that all reasonable minds would, as to the same circumstances, conclude that there was no fault or lack of care in maintaining the sand pile as it was? We do not think so. We might almost take judicial notice that such a sand pile in a public street is inviting to children. As to its danger, it may well be said that no average, thinking citizen would confidently expect it to do harm, but, on the other hand, he might well reason that it could very easily become, as the result of digging, even in play, a serious danger, and such being the situation, it would seem that, under the law, it was not only proper, but necessary to submit the matter, as a question of fact, to the jury. It was so submitted, and the jury found that the defendants were guilty of negligence. Are we now entitled to override that verdict? We do not think so.''

The court further said (p. 514): ''The fact, therefore, that this sand pile in which the boy was suffocated was in a public highway becomes important in determining whether or not the evidence justified submitting the case to the jury, and distinguishes the instant case from all the cases cited where the *locus in quo* was on private property.''

The following are some of the Illinois non-trespass cases wherein judgments for plaintiffs were sustained upon the theory that an attractive nuisance was present: *Engel v. City of Chicago,* 290 Ill. App. 604; *Petrovic v. City of Chicago,* 251 Ill. App. 542 (cert. denied by Sup. Court); *Fleming v. City of Chicago,* 260 Ill. App. 496; *Brownell v. Village of Antioch,* 215 Ill. App. 404; *Stedwell v. City of Chicago,* 297 Ill. 486; *Shapiro v. City of Chicago,* 308 Ill. App. 613; *Harrison v. City of Chicago,* 308 Ill. App. 263.

In *Deming v. City of Chicago,* 321 Ill. 341, a nine year old boy was electrocuted when he climbed a tree to retrieve a kite which had become lodged in the branches, and came in contact with an uninsulated electric wire that passed through the tree about twenty feet above the ground. There the court said (p. 343):

"This injury occurred in a tree in a public street and the deceased was, therefore, not a trespasser at the time he was killed. (*Stedwell v. City of Chicago,* 297 Ill. 486.) Plaintiff in error was bound, in placing in the street wires which carried a heavy load of electricity, to guard against accidents by the exercise of that degree of care commensurate with the danger incident to the use of such a dangerous agency. (*Hausler v. Commonwealth Electric Co.,* 240 Ill. 201.) Whether the tree located in the public street was so attractive to children in their sports as to suggest the probability of such an accident as occurred, and whether the city was negligent in maintaining the wires as it did, were questions for the jury. (*Stedwell v. City of Chicago, supra.*) There was sufficient evidence of negligence to justify the court in submitting the case to the jury, and the motion to direct a verdict was properly overruled."

Defendant contends that the Supreme Court, in the case of *Burns v. City of Chicago,* 338 Ill. 89, stated that the principle of attractive nuisance must be very

cautiously applied. In that case, the opinion quotes from the opinion in *United Zinc Co. v. Britt,* 258 U. S. 268, wherein that court said (pp. 274, 275):

"*Union Pacific Ry. Co. v. McDonald,* 152 U. S. 262, and kindred cases were relied upon as leading to the result, and perhaps there is language in that and in *Railroad Co. v. Stout,* 17 Wall. 657, that might seem to justify it; but the doctrine needs very careful statement not to make an unjust and impracticable requirement. . . . Infants have no greater right to go upon other peoples' land than adults, and the mere fact that they are infants imposes no duty upon landowners to expect them and to prepare for their safety. On the other hand the duty of one who invites another upon his land not to lead him into a trap is well settled, and while it is very plain that temptation is not invitation, it may be held that knowingly to establish and expose, unfenced, to children of an age when they follow a bait as mechanically as a fish, something that is certain to attract them, has the legal effect of an invitation to them although not to an adult. *But the principle if accepted must be very cautiously applied.*" (Italics ours.)

The opinion in the *Burns* case, written by Commissioner Edmunds, cites that part of the opinion in *United Zinc Co. v. Britt, supra,* which we have heretofore quoted, and states (p. 100):

"In our opinion the position thus recently taken by the Supreme Court of the United States to the effect that a doctrine which is admittedly an exception to established rules of law 'must be very cautiously applied,' is sound as well as significant."

Mr. Justice HOLMES, who wrote the opinion in *United Zinc. Co. v. Britt,* was passing upon a case where a child was a trespasser upon the land of the defendant, and where it was held that no license or invitation could be implied from the facts in evidence. That case did not apply to the facts in the *Burns* case,

where the attractive nuisance was situated in a public street, at the curb. The *Burns* case was decided upon the finding that the alleged attractive nuisance was not an attractive nuisance; that the boy at the time of his death was killed by an electric shock received while at the top of a twenty-six foot tubular steel pole owned by the defendant for street lighting purposes; that the pole was not an attractive nuisance and that the boy climbed it by extraordinary effort *and for the purpose of winning a wager.*

In *Wolczek v. Public Service Co.,* 342 Ill. 482, the court stated (pp. 490, 491): "Cases cited by plaintiff in error are to be distinguished on the facts and are not to be taken as a modification or limitation on this rule. Of such case is *Burns v. City of Chicago,* 338 Ill. 89, where it was held that the evidence concerning a tubular steel electric light pole did not tend to prove that that pole was attractive to children. In that case it was also held that the pole was not the proximate cause of the injury but that the boy climbing it was induced to do so by reason of wagers made between himself and other boys." Mr. Justice Stone, who wrote the opinion in the *Wolczek* case, refers to *United Zinc Co. v. Britt, supra,* and calls attention to the fact that three of the justices dissented from the opinion in that case and states that the opinion of the dissenters is in accord with the rule "long established in this State." (p. 491) *Mindeman v. Sanitary District,* 317 Ill. 529, cited by defendant, involves a trespass case. In *Simons v. Dole Valve Co.,* 288 Ill. App. 288, cited by defendant, the plaintiff contended that the defendant maintained an attractive nuisance on its premises which remained unguarded to children as invitees. *Dabrowski v. Illinois Cent. R. Co.,* 303 Ill. App. 31, cited by defendant, not only involved a trespass upon the right of way of the railroad company but the evidence showed that children found a partly burned fusee on the right of way and took it home,

and that subsequently another child, who was plaintiff's brother, lighted the fusee, which ignited plaintiff's dress, and the court held as a matter of law that even if the railroad company was negligent in leaving the fusee burning on its right of way, that negligence was not the proximate cause of plaintiff's injury. Defendant cites two decisions of sister States but in our opinion it is unnecessary for us to consider them, in view of the fact that many Illinois decisions bear directly upon the question before us.

Unless all reasonable minds would agree that the ditch, the adjoining embankment, the lantern, the flare, all situated very near a public playground, frequented by many young children, did not constitute an attractive nuisance, the question became one of fact for the jury to determine. (See *Flis v. City of Chicago, supra,* p. 133, and the cases there cited.) Prior to the accident children played about the ditch and lighted torches made of paper and sticks from the open flares; "the kids on the block" played there. Children took long sticks, wrapped paper or something around them, and lit them on the flares and they ran around with the lighted sticks. Sometimes the watchman drove the children away. When the children saw the watchman they ran away from the place. Richard testified that the watchman was not there that night. Defendant maintained a twenty-four hour watchman service upon this work. "The shifts were 8 a. m. to 4:30 p. m., 4:30 p. m. to midnight, and midnight to 8 a. m. the following morning . . . one watchman on each shift." There were twenty flares and twenty-five red lanterns on this job. Although the work at the time of the accident did not extend the distance of two blocks the watchman who was supposed to be upon duty at the time of the accident testified that he did not know that evening that an accident had happened and that the first that he heard about it was when he was told about it the next day. Motycka testified that

as he approached Kolin avenue and 25th place he saw a burst of flames flare up into the air from the excavation and that when he got the plaintiff out of the hole and stood him up "the flames were shooting from his waistline to about three feet over his head;" that he called for help but nobody showed up. The watchman testified that he was present on that evening and was attending to his duties, but that he did not see anything unusual occur from 4 p. m. until 12 o'clock midnight on November 3, 1938. He stated, at first, that his duty was to watch the properties of the City of Chicago on that project and that his duties did not call upon him to look out for children, but he finally admitted that it was a part of his business to chase children away and keep them away from the flares and ditches, but that he had never had occasion to chase or keep them away. We are satisfied that if this watchman had been performing his duties upon that evening the accident to plaintiff, with all of its terrible consequences, would not have occurred. Because of the close proximity of the public playground the watchman should have been extremely vigilant in the performance of his duty to keep the children away from the flares and ditches. The only reasonable inference that can be drawn from the evidence is that the watchman was absent from the job at the time in question. We hold that under plaintiff's evidence the question as to whether the *locus in quo* constituted an attractive nuisance became one of fact for the jury to determine, and the jury has determined the question adversely to defendant's contention. We feel impelled to say that we are satisfied with their finding.

But plaintiff's case does not entirely depend upon a finding that the *locus in quo* constituted an attractive nuisance, as defendant assumes. The complaint charges that defendant was negligent in failing to maintain a watchman at the place to prevent children from playing about in close proximity to the flares.

It further charges that the flare used was not so ballasted, shaped, weighted, or placed as to be substantial and not easily upset or turned over. It further charges that the fuel in the torch was volatile and of a dangerous character, and the flare was not in proper and safe working order. The complaint also charges general negligence. In our judgment even if it could be held that the situation presented did not constitute an attractive nuisance, nevertheless, under the pleadings and the evidence in the case plaintiff made out a clear case of negligence against defendant. As we stated in *Flis v. City of Chicago, supra,* (pp. 134, 135) : ''The attractive nuisance charge, if proved, would be but a circumstance bearing upon the question of the alleged negligence of the defendant.'' There was sufficient evidence of negligence to justify the court in submitting the case to the jury, and the motion to direct a verdict was properly overruled.

Defendant seems to assume that plaintiff's case falls if the allegation in count 2 that ''the flare violently exploded'' is not established by the evidence, and it contends that the testimony of the two children is not sufficient to prove the said allegation. In meeting the testimony of the two boys that the flare exploded defendant relies upon testimony adduced by it which it claims proves that the flare could not have exploded. It is hardly necessary to state that defendant's evidence could not be used upon a motion to direct nor upon a motion for judgment notwithstanding the verdict. That the testimony of the two boys makes out a *prima facie* case that the flare exploded seems obvious, but defendant contends that plaintiff should not have been allowed to use the term ''exploded'' in his direct examination. It would be sufficient to say in answer to this contention that upon cross-examination plaintiff testified that Richard ''was trying to light this stick on this flare, and the flare upset and exploded.'' Defendant made no objection to the

use of the term in that answer and made no motion to strike the answer. However, the term is a well understood one. Webster defines it as, "to cause to explode or burst noisily."

No good reason has been urged why the judgment in this case should be reversed and it is therefore affirmed.

*Judgment affirmed.*

FRIEND, P. J., and SULLIVAN, J., concur.